SIXTH DIVISION
June 18, 2010

No. 1-07-2222

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | Nos. 99 CR 23858 |
| | ) | |
| MARCELINO MALDONADO, | ) | Honorable |
| | ) | Dennis J. Porter, |
| Defendant-Appellant. | ) | Judge Presiding. |

USTICE ROBERT E. GORDON delivered the opinion[1] of the court:

Defendant, Marcelino Maldonado, was convicted on May 1, 2007, by a jury of the first-degree murder of Maribel Jiminez, his former lover, and the attempted first-degree murder of William Saquimux, Jiminez's then current lover. The State's theory of the case was that defendant became enraged when he learned that Jiminez,

---

[1]Pursuant to our supreme court's supervisory order of November 25, 2009, the opinion filed on August 10, 2009, was vacated on December 8, 2009, and the following opinion is now filed in its stead.

No. 1-07-2222

who had jilted him the day before, was with another lover, and he went to her apartment, found the two lovers and stabbed them both, killing Jiminez and wounding Saquimux. Defendant was sentenced on June 4, 2007, to consecutive terms of 60 and 30 years' imprisonment.

After the trial court denied his posttrial motion for a new trial, he filed this direct appeal. On appeal, defendant claims that the trial court abused its discretion: (1) by overruling defense objections to the admission into evidence of gruesome photographs of the victim's body; (2) by overruling a defense objection to a remark during the State's closing that defendant's brother "knew"; (3) by overruling an objection to testimony by a forensic scientist that he had received defendant's fingerprint card from the Bureau of Identification; (4) by granting the State's motion to bar the defense from arguing during its closing that the father of the murder victim's children could have committed the charged crimes; and (5) by refusing to answer a question from the jury during its deliberations. For the following reasons, we affirm.

In addition, defendant claims that he is entitled to a $15 reduction in the costs and fees that he was ordered to pay, and the State agrees. In an opinion filed on August 10, 2009, and vacated on December 8, 2009, we had found that defendant

2

was not entitled to the reduction. On August 20, 2009, defendant moved to supplement the appellate record concerning this issue; and on August 31, 2009, the appellate court denied defendant's motion as untimely. In a supervisory order, the Illinois Supreme Court directed this court on November 25, 2009, to permit defendant to supplement the record and to reconsider our judgment concerning this issue in light of the supplemented record. For the reasons discussed below, we now order defendant's fines and fees reduced by $15 from $895 to $880, and order that his mittimus be corrected accordingly.

BACKGROUND

1. Procedural History

Defendant was arrested on October 1, 1999, in connection with the stabbing deaths of Maribel Jiminez and William Sauimux, which occurred earlier that same day. On October 22, 1999, defendant was indicted on 14 counts, but the State proceeded to trial on only 3 counts: (1) first-degree murder for intentionally or knowingly stabbing and killing Jiminez; (2) first-degree murder for stabbing and killing Jiminez knowing that the stabbing created a strong probability of death or great bodily harm; and (3) attempted first-degree murder for stabbing Saquimux with the intent to kill him. After the jury returned verdicts of guilty, the trial court

No. 1-07-2222

merged count II into count I, and entered the convictions.

A short note of explanation is needed about why a crime committed on October 1, 1999, did not proceed to trial until eight years later on May 1, 2007. Between December 15, 1999, and March 25, 2005, this case was continued 51 times. On April 4, 2005, the trial court held a hearing on defendant's motion, filed October 6, 2004, to declare defendant ineligible for the death penalty due to mental retardation. On April 4, 2005, the motion was denied.

Between May 3, 2005, and August 8, 2006, there were 31 more continuances. On August 28, 2006, the trial court held a hearing on defendant's motion to preclude the State from seeking a sentence in excess of 45 years and denied the motion on the same day. Between October 16, 2006, and April 17, 2007, there were 12 more continuances. On April 20, 2007, jury selection began, and the trial concluded on May 1, 2007, with the jury's verdicts of guilt.

## 2. Evidence at Trial

Since defendant does not challenge the sufficiency of the evidence against him, we do not need to describe it in detail. In addition, as explained below, we do not find that the trial court committed any error. Thus, we do not need to analyze whether overwhelming evidence rendered an error harmless.

4

In sum, the State called 11 witnesses: (1) Romana Puente, who was Jiminez's sister and who identified Jiminez's body; (2) Assistant State's Attorney Joan Kuruc, who took defendant's statement; (3) Tiffany Blake, who lived in the same apartment as Jiminez and who testified that Jiminez had broken up with defendant the day before the murder; (4) William Saquimux, the surviving victim and the man with whom Jiminez was sleeping at the time of her death; (5) Detective Jeong Park, who responded to the initial call about a stabbing; (6) Detective Steven Kostecki, a forensic investigator, who recovered a bent knife from behind Jiminez's bedroom door, a bloody knife from her backyard, a bloody T-shirt from defendant's home, defendant's shoes from defendant's person, and blood that was located on defendant's right shin and left ankle; (7) Detective Thomas Conley, who observed the crime scene and participated in defendant's arrest; (8) Amy Hart, a fingerprint examiner, who testified that none of the prints submitted to her for examination matched defendant's prints; (9) Dr. Scott Denton, a forensic pathologist, who testified that Jiminez's death resulted from stab wounds; (10) Gregory DiDomenic, a forensic scientist, who testified that blood removed from defendant's ankle, T-shirt and shoe revealed DNA that matched Jiminez's DNA; and (11) Detective Randy Troche, who witnessed the taking of defendant's statement by the assistant State's

No. 1-07-2222

Attorney.

The State's evidence included: DNA evidence that blood removed from defendant's person matched the victim; and a written confession from defendant describing the crimes in detail. Saquimux, the surviving victim, testified at trial. However, at trial, he claimed not to know the identity of his attacker. Before trial, he had provided a statement to the police saying that the assault on him had occurred at another location and was gang-related.

In defendant's confession, which was written down by Assistant State's Attorney Joan Kuruc, defendant stated the following. He met Jiminez about a month ago and they started dating "right away." Defendant slept at Jiminez's apartment approximately two or three times a week. Defendant stated that sometimes he felt confused and that Jiminez would make him angry "by playing games with his heart." On September 30, 1999, Jiminez told defendant that she was "breaking up with him." Shortly after midnight on the following day, October 1, 1999, defendant ran into Jiminez's housemates, Tiffany and Orlando, on the street. Orlando informed defendant that Jiminez was with another man. Defendant then walked over to Jiminez's apartment and approached by "the back way."

Defendant further stated that, after knocking on the door and receiving no

6

response, defendant climbed into the apartment through the pantry window. He retrieved two knives from Jiminez's kitchen and knocked on her closed bedroom door. When he received no answer, he opened the door and, apparently in the dark, felt in front of him with his hand until he felt Jiminez's leg. Jiminez said, "what are you doing here, get out." Defendant stated that he then stabbed Jiminez in the chest near her shoulder. He stabbed her a couple of more times, and then she fell off the bed onto the floor. After Jiminez fell to the floor, defendant kicked her near her face, and then stabbed her some more while she was on the floor.

Defendant then stated that he saw a man sit up in Jiminez's bed. Defendant stabbed the man approximately three or four times. When defendant was stabbing the man, the knife broke, cutting defendant's right hand in two places. Defendant then threw the broken knife on the floor and walked out of the bedroom. Defendant entered the room in which Tiffany and Orlando lived, and he took Orlando's radio, because defendant had never liked Orlando. Defendant threw the second knife into the yard and washed the blood off his hands in the kitchen sink. On his way home, defendant threw Orlando's radio into an alley.

The defense case consisted of three stipulations, which concerned defendant's IQ and defendant's lack of apparent injuries on October 2, 1999, the

7

No. 1-07-2222

day after the crimes.

ANALYSIS

On appeal, defendant claims that the trial court abused its discretion: (1) by admitting gruesome photographs of the victim's body into evidence; (2) by overruling a defense objection to a remark in the State's closing argument that defendant's brother "knew"; (3) by admitting into evidence testimony by a forensic scientist that he had received defendant's fingerprint card from the Bureau of Identification; (4) by granting the State's motion to bar the defense from arguing in its closing that the father of the murder victim's children could have committed the charged crimes; and (5) by refusing to answer a question from the jury during its deliberations. For the following reasons, we affirm.

1. Gruesome Photographs

Defendant claims that the trial court abused its discretion when it admitted into evidence photographs of the murder victim's body taken both at the crime scene and at the morgue. Defendant argues, first, that the only issue at trial was the identity of the attacker and that these photographs had limited probative value on this issue; and, second, that, even if the photographs had probative value, their probative value was substantially outweighed by their unfair prejudice.

8

No. 1-07-2222

a. Standard of Review

There is no dispute about the appropriate standard of review. Evidentiary rulings, like the one at issue here, are within the sound discretion of the trial court; and we will not reverse them on appeal unless the trial court abused its discretion. People v. Caffey, 205 Ill. 2d 52, 89 (2001). "An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." Caffey, 205 Ill. 2d at 89. Our supreme court has specifically held that whether or not a jury is allowed to see the photographs of a stabbing victim, taken at both the crime scene and at the morgue, is "a decision made be a trial judge in the exercise of his sound discretion." People v. Henderson, 142 Ill. 2d 258, 319-321 (1990) (finding no abuse of discretion in the admission of 18 crime scene and morgue photographs of a murder victim, who had been stabbed 40 times).

However, there is a dispute about whether plain error review applies and, if so, to what issues. The State claims that our review is limited to a plain error review with respect to (1) the morgue photographs; and (2) the admission of any of the photographs into evidence. First, although defendant objected at trial, defendant's posttrial motion specified only the crime scene photographs, and did not

9

refer to the morgue photographs. Second, the State observes that defendant's posttrial motion objected only to the publication of the photographs to the jury, and not to their admission into evidence. Thus, the State claims that defendant waived any issues with respect to the admission of any photographs into evidence.

The Illinois Supreme Court has held that a "defendant must both specifically object at trial and raise the specific issue again in a posttrial motion to preserve any alleged error for review." People v. Woods, 214 Ill. 2d 455, 470 (2005); People v. Piatkowski, 225 Ill. 2d 551, 564 (2007). When a defendant has failed to preserve an error for review, we may still review for plain error. Piatkowski, 225 Ill. 2d at 562-63; 134 Ill. 2d R. 615(a) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court").

"[T]he plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurs and the evidence is so closely balanced that the error alone threaten[s] to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurs and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." Piatkowski, 225 Ill. 2d at 565; Woods, 214 Ill. 2d at 471. With a plain

error analysis, "it is the defendant who bears the burden of persuasion with respect to prejudice." Woods, 214 Ill. 2d at 471.

The State is correct that the defendant's posttrial motion failed either to mention the morgue photographs or to contest the admission into evidence of any photographs. In his posttrial motion, defendant claimed with respect to photographs only that "[t]he Court erred in permitting publication of People's Exhibits Numbers 28, 29, 30, 31, 32, 33, 34, 35 and 36." The photographs specified in this list are only the photographs taken of the murder victim at the crime scene. The exhibit numbers of the photographs taken at the morgue are omitted from the list. Also, as this quote indicates, the defendant contested "publication" rather than "admission."

In response, defendant claims that our review is not limited to plain error review because (1) defendant's objection was, in part, to the cumulative impact of all 23 photographs on the jury, and thus all the photographs come within the scope of this court's review; and (2) whether defendant used the word "publication" or "admission" is irrelevant, because the issue is what the jury saw and its impact on them.

However, in order to find plain error, we must first find that the trial court committed some error. Piatkowski, 225 Ill. 2d at 565 ("the first step is to determine

11

whether error occurred"). As discussed in the section below, since we do not find error, we do not reach the question of whether the claimed error rose to the level of plain error.

### b. Probative Value and Unfair Prejudice

The trial court did not err in admitting photographs of the victim, because they were relevant, and their probative value was not outweighed by unfair prejudice to defendant.

Generally, evidence must be relevant to be admitted. People v. Williams, 384 Ill. App. 3d 327, 333 (2008). To establish the relevance of a piece of evidence, a party must: (1) identify the "fact" that it is seeking to prove with the piece of evidence; (2) explain how this fact is "of consequence" to the determination of the action; and (3) show how the evidence "tends to make the existence" of this fact "more or less probable than it would be without the evidence." People v. Beaman, 229 Ill. 2d 56, 75-76 (2008). Even after a party establishes relevance, the trial court may still exclude the evidence, if the evidence creates an unfair prejudice that substantially outweighs its probative value. Williams, 384 Ill. App. 3d at 333.

The State claims that the photographs were relevant to show (1) the truth and accuracy of defendant's confession, and thus his identity as the perpetrator; and (2)

the required mental state, specifically, defendant's intent to kill. Our supreme court has held:

> "Among the valid reasons for admitting photographs of a decedent is to prove the nature and extent of injuries and the force needed to inflict them; the position, condition, and location of the body; the manner and cause of death; to corroborate a defendant's confession; and to aid in understanding the testimony of a pathologist or other witness." Henderson, 142 Ill. 2d at 319-20.

Thus, the reasons offered by the State fall within the list of valid reasons given by our supreme court.

At trial, defense counsel made the following objection to publication of the morgue photographs, specifically, People's exhibit Nos. 2 and 62 through 71:

> "DEFENSE COUNSEL: Judge, the State's next witness, I believe is Dr. Denton, the interim chief medical examiner [and forensic pathologist], and they're going to put the protocol in through him. They, also being the State, are intending to publish the morgue photos. The

morgue photos have been numbered already as 62 through 71.

Judge, [People's exhibit No.] 2 has been identified but not published, so none of these have been published. Judge, our objection to publishing them would be that they are close-up photographs of the deceased during the autopsy showing gruesome injuries and also of course she's unclothes [sic] clothed [sic]. We have made this objection to the photos of her at the scene and we understand the Court's ruling.

I would suggest based on the Court's ruling, that the jury has all the probative evidence they need. This adds nothing in a probative manner that couldn't be testified to without resorting to gruesome photos.

The doctor certainly can describe injuries that were documented or photographed without the jury having to look at them. We do believe that they are more prejudicial than probative, and we would ask that you bar

the State from publishing 2 and 61."

In response, the trial court made the following ruling:

"THE COURT: Your objection is overruled. Most of them are just photos of the cuts that are up close. He can describe the cuts. They're just pictures of the wounds, they're close-up of the wounds. We have one where the cuts are on the face. There's just a large number of cuts on the face. I don't think they're particularly gruesome, quite frankly. And they show the cuts. As I indicated, the nature and number and manner of infliction of these wounds is important to the case ***."

To support its contention that the photographs were unfairly prejudicial, defense counsel cites: (1) the 30-year-old case of People v. Garlick, 46 Ill. App. 3d 216 (1977); and (2) the more recent opinion in People v. Jackson, 372 Ill. App. 3d 112 (2007), which was reversed on other grounds by our supreme court in People v. Jackson, 232 Ill. 2d 246 (2009).

In the appellate court opinion in Jackson, this court stated that the trial court did not abuse its discretion in admitting autopsy photographs, even though we found

the photographs to be "grisly." Jackson, 372 Ill. App. 3d at 126-27. In Jackson, we found no abuse of discretion, because the issue of guilt and the issue of whether the crime was brutal or heinous were addressed in the same proceeding, and "the grisly autopsy photographs shed light on whether the crime was brutal." Jackson, 372 Ill. App. 3d at 126-27. However, we "observe[d]" that if the trial had been bifurcated, then certain photographs "may" have been unduly prejudicial if admitted during the phase devoted solely to guilt. Jackson, 372 Ill. App. 3d at 126-27.

However, the ambiguous "may" statement in Jackson does little to aid defendant's argument. First, in Jackson, this court reached the opposite conclusion that defendant is seeking; namely, in Jackson, we found no abuse of discretion. Jackson, 372 Ill. App. 3d at 126-27. Second, in Jackson, we stressed that our statements about the photographs were merely dicta, because they were "not determinative of our ultimate decision in this case." Jackson, 372 Ill. App. 3d at 124. Third, the photographs at issue in Jackson were taken during an autopsy and "depict[ed] grisly autopsy details," making them particularly "grisly," and thus, different in kind and degree than the photographs at issue here which were taken at the crime scene and at the morgue. Jackson, 372 Ill. App. 3d at 118, 126.

In Garlick, as in Jackson, the appellate court's comments about the

16

photograph were mere dicta, since the appellate court had already decided that a new trial was warranted on other grounds. Garlick, 46 Ill. App. 3d at 223. In addition, in Garlick, there was no issue concerning the identity of the perpetrator, since the defendant had admitted the murder. His sole defense, and the sole issue in the case, was his claimed insanity. By contrast, in the case at bar, defendant claims that he was not the perpetrator, and thus, the State needed the photographs to corroborate defendant's confession and confirm his identity.

After reviewing the photographs in question, we agree with the assessment of the trial court that the probative value of the photographs outweighed any unfair prejudice. First, we note that defendant on appeal poses no objection to People's exhibit No. 2, which depicted the victim's face and shoulders. Defendant objects to the remaining 23 photographs, namely 10 photographs of the body taken at the morgue[2] and 13 photographs of the body taken at the crime scene.[3]

Second, the 10 morgue photographs are not particularly gruesome. They are cropped to show only discrete parts of the body. Most of the wounds appear to

---

[2] The 10 morgue photographs at issue are People's exhibit Nos. 62 through 71.

[3] The 13 crime scene photographs at issue are People's exhibit Nos. 11, 20, 22, 25 and 28 through 36.

have been cleaned; and thus, though they are red, they are practically bloodless.

Third, the crime scene photographs aid in depicting the events. People's exhibit No. 11 depicts the hallway in the victim's apartment, and a portion of the victim's body is barely discernible through an open doorway. People's exhibit No. 20 depicts the bed with a bloody sheet and mattress, and only a portion of the victim's legs are visible next to the bed. People's exhibit No. 22 shows the victim's entire body, as she was found lying on her bedroom floor. However, the number and extent of the individual wounds are not discernible from this photograph. People's exhibit No. 25 shows the hallway, which is also depicted in exhibit No. 11, but from a different angle. As with exhibit No. 11, a portion of the victim's body is shown in exhibit No. 25 through an open doorway, but there is almost no blood in the photograph, except for a smudge on one wall of the hallway. Exhibit Nos. 28 and 29 are gruesome: they show stab wounds to the victim's face. However, they are no more gruesome than the crime itself, and they are probative in understanding the motive and intent of the perpetrator. Exhibit Nos. 30 through 36 depict the individual wounds. Although a number of the crime scene photographs are gruesome, they were highly probative in portraying the event, and thus their probative value outweighed any unfair prejudice.

No. 1-07-2222

For these reasons, we find no abuse of discretion. People v. Henderson, 142

Ill. 2d 258, 319-21 (1990) (finding no abuse of discretion in the admission of 18

crime scene and morgue photographs of a murder victim, who had been stabbed 40

times).

## 2. State's Closing Argument

Defendant claims that the trial court erred by overruling a defense objection

to a remark during the State's closing. A detective had testified at trial that, after

the defendant's brother provided detectives with a bloody shirt worn by defendant,

the brother started crying. The remark at issue is a comment during the state's

rebuttal closing that defendant's brother "knew."

### a. Standard of Review

It is not clear whether the appropriate standard of review for this issue is de

novo or abuse of discretion. This court has previously made this same observation

in both People v. Phillips, No. 1-07-0985 (June 15, 2009), and People v. Johnson,

385 Ill. App. 3d 585, 603 (2008). The Second District has agreed with our

observation that the standard of review for closing remarks is an unsettled issue.

People v. Robinson, 391 Ill. App. 3d 822 (2009).

The confusion stems from an apparent conflict between two supreme court

19

cases: People v.Wheeler, 226 Ill. 2d 92, 121 (2007), and People v. Blue, 189 Ill.
2d 99, 128, 132 (2000). In Wheeler, our supreme court held: "Whether statements
made by a prosecutor at closing argument were so egregious that they warrant a new
trial is a legal issue this court reviews de novo." Wheeler, 226 Ill. 2d at 121.
However, the supreme court in Wheeler cited with approval Blue, in which the
supreme court had previously applied an abuse of discretion standard. Wheeler,
226 Ill. 2d at 121. In Blue and numerous other cases, our supreme court had held
that the substance and style of closing argument are within the trial court's
discretion, and will not be reversed absent an abuse of discretion. Blue, 189 Ill. 2d
at 128, 132 ("we conclude that the trial court abused its discretion" by permitting
certain prosecutorial remarks in closing); People v. Caffey, 205 Ill. 2d 52, 128
(2001); People v. Emerson, 189 Ill. 2d 436, 488 (2000); People v. Williams, 192 Ill.
2d 548, 583 (2000); People v. Armstrong, 183 Ill. 2d 130, 145 (1998); People v.
Byron, 164 Ill. 2d 279, 295 (1995). Our supreme court had reasoned: "Because the
trial court is in a better position than a reviewing court to determine the prejudicial
effect of any remarks, the scope of closing argument is within the trial court's
discretion." People v. Hudson, 157 Ill. 2d 401, 441 (1993). Following Blue and
other supreme court cases like it, this court had consistently applied an abuse of

No. 1-07-2222

discretion standard.  <u>People v. Tolliver</u>, 347 Ill. App. 3d 203, 224 (2004); <u>People v. Abadia</u>, 328 Ill. App. 3d 669, 678 (2001).

Since <u>Wheeler</u>, appellate courts have been divided regarding the appropriate standard of review.  The First District has applied an abuse of discretion standard, while the Third and Fourth Districts have applied a <u>de</u> <u>novo</u> standard of review.  Compare <u>People v. Love</u>, 377 Ill. App. 3d 306, 313 (1st Dist. 2007), and <u>People v. Averett</u>, 381 Ill. App. 3d 1001, 1007 (1st Dist. 2008), with <u>People v. McCoy</u>, 378 Ill. App. 3d 954, 964 (3d Dist. 2008), and <u>People v. Palmer</u>, 382 Ill. App. 3d 1151, 1160 (4th Dist 2008). However, we do not need to resolve the issue of the appropriate standard of review at this time,  because our holding in this case would be the same under either standard.  This is the same approach that we took in both <u>Phillips</u> and <u>Johnson</u>, and the same approach taken by the Second District in its <u>Robinson</u> opinion.  <u>Phillips</u>, No. 1-07-0985; <u>Johnson</u>, 385 Ill. App. 3d at 585; <u>Robinson</u>, 391 Ill. App. 3d at 840, ("In any event, like the <u>Johnson</u> court, we leave the resolution of this issue to another day, as our conclusion would be the same applying either standard.").

b. Substantial Prejudice

21

A State's closing will lead to reversal only if the prosecutor's remarks created "substantial prejudice." Wheeler, 226 Ill. 2d at 123, People v. Johnson, 208 Ill. 2d 53, 64 (2003); People v. Easley, 148 Ill. 2d 281, 332 (1992) ("The remarks by the prosecutor, while improper, do not amount to substantial prejudice"). Substantial prejudice occurs "if the improper remarks constituted a material factor in a defendant's conviction." Wheeler, 226 Ill. 2d at 123.

When reviewing claims of prosecutorial misconduct in closing argument, a reviewing court will consider the entire closing arguments of both the prosecutor and the defense attorney, in order to place the remarks in context. Wheeler, 226 Ill. 2d at 122; People v. Johnson, 208 Ill. 2d 53, 113 (2003); People v. Tolliver, 347 Ill. App. 3d 203, 224 (2004). A prosecutor has wide latitude during closing argument. Wheeler, 226 Ill. 2d at 123; Blue, 189 Ill. 2d at 127. "In closing, the prosecutor may comment on the evidence and any fair, reasonable inferences it yields." People v. Nicholas, 218 Ill. 2d 104, 121 (2005). Thus, this court will also consider the evidence that led to the remarks at issue.

In the case at bar, the remark at issue was based on the testimony of Detective Thomas Conley. Conley testified that when he and his partner went to search defendant's bedroom, they were accompanied by defendant's brother, Donny

22

No. 1-07-2222

Maldonado. Conley described the interaction between the brother and the police officers, as follows:

"PROSECUTOR: When Donnie was in the bedroom with you, did you say anything to Donnie?

DETECTIVE: Yes, I did.

PROSECUTOR: What was that?

DETECTIVE: I asked Donnie what Marcelino was wearing when he came home in the early morning hours.

PROSECUTOR: Now, without telling us anything Donnie said, what did Donnie do at that point?

DETECTIVE: Donnie immediately went to the closet and picked up a shirt that was on top of the pile of clothes on the floor. The shirt was inside out, he immediately turned it right side out.

PROSECUTOR: What did he do with the shirt then?

DETECTIVE: He then gave it to me and I held it up to examine the shirt.

23

PROSECUTOR: When you held this shirt up and examined it, did you notice anything about it?

DETECTIVE: Yes, I did.

PROSECUTOR: What did you notice?

DETECTIVE: It was a beige shirt with a Roadrunner Looney Tunes character on it. There was what appeared to me to be blood on the left sleeve and then down by the bottom of the shirt on the right side.

PROSECUTOR: What happened next?

DETECTIVE: We immediately called for the crime lab to come and photograph and inventory the shirt.

PROSECUTOR: When you turned and looked and examined the shirt, was Donnie still in the room?

DETECTIVE: Yes, he was.

PROSECUTOR: What happened?

DETECTIVE: Donnie started crying."

Based on the above testimony, the prosecutor during rebuttal argued: "And the defendant's own brother started crying because he knew, ladies and gentlemen,

at that moment that the defendant had done what he did." Defense counsel objected, and the trial court sustained the objection. The trial court specifically instructed the jury "to disregard the last remark."

After the trial court's instruction, the prosecutor continued:

> "PROSECUTOR: Donnie Maldonado was crying, ladies and gentlemen, because as Detective Conley saw it, there was blood on the shirt. Donnie Maldonado was at 4910 Spaulding [the home of defendant and his mother and brother] when the police came to find out what it was that the defendant was wearing. The defendant had already been taken away by the police in that morning hours, approximately 10 o'clock in the morning. Donnie Maldonado knew, ladies and gentlemen.
>
> DEFENSE COUNSEL: Objection, your honor.
>
> THE COURT: You may continue. Overruled."

After closing arguments and jury instructions were completed, defense counsel moved for a mistrial, in part, because the prosecutor's remark "left it hanging [about] what it was he knew." Denying the motion, the trial court stated:

25

"THE COURT: With regard to Donnie

Maldonado, I sustained your objection. The one reference

to him that I did not because it was properly argued from

the facts that you could infer that he was aware of

something, although not exactly what he was aware of,

but it was argued in a proper manner so I did not sustain

the objection to that."

We agree with the trial court that the prosecutor's second remark argued that

the brother knew "something, although not exactly what." The "something" is

ambiguous. It could be that the brother "knew," as did the detectives, that the shirt

had blood on it. One highly ambiguous remark is not enough to warrant a mistrial

or to create substantial prejudice.

Thus, under either a <u>de novo</u> or an abuse of discretion standard of review, we

find that the trial court did not err by overruling defendant's objection to the State's

comment that the brother "knew."

### 3. Defendant's Fingerprint Card

Defendant claims that the trial court abused its discretion by overruling an

objection to testimony by a fingerprint examiner that she obtained defendant's

fingerprint card from the "Bureau of Identification in Joliet." Defendant argues that the jury was likely to infer from this testimony that defendant had a prior criminal record, and thus, that is why the Bureau of Identification had a fingerprint card on file for him.

Our standard of review for this issue is abuse of discretion. Our supreme court has held that a trial court's decision to allow a limited reference to a database, such as the one in this case, is reviewed under an abuse of discretion standard. People v. Jackson, 232 Ill. 2d 246, 266-67 (2009).

Defendant's claim concerns testimony by Amy Hart, a fingerprint examiner employed by the Illinois State Police. Even though Hart was called as a State witness, she provided testimony favorable to the defense, namely that none of the exhibits submitted to her for examination revealed prints that matched defendant's prints. Hart testified that, in connection with defendant's case, she received a drinking glass, a cigarette package, a pair of sunglasses, two knives and "then at an even later date I received some fingerprint cards."

Hart's testimony about the Bureau of Identification card occurred during her testimony about the sunglasses:

"PROSECUTOR: And what did your examination

27

reveal with respect to the sunglasses, People's Exhibit

Number 81 B?

HART: I compared it to fingerprint cards, that one

was submitted by the Chicago Police Department and one

fingerprint card I requested from the Bureau of

Identification in Joliet.

PROSECUTOR: And the fingerprint card, was that

of a Marcelino Maldonado, is that correct?

HART: The one that I requested from the Bureau of

Identification was marked Marcelino Maldonado.

DEFENSE ATTORNEY: Objection.

THE COURT: Objection overruled.  The answer

may stand."  (Emphasis added.)

After Hart finished her direct examination, defense counsel requested "a sidebar

based on the objection," and the following discussion occurred outside the presence

of the jury:

"DEFENSE ATTORNEY: At the earliest possible

time we make a motion for a mistrial based on Bureau of

28

Identification. We have a DCFS[4] on there. They called for fingerprints, Bureau of Identification. The Court knows what it is, the Prosecutor knows what it is. She repeated it. She brought it out of the witness. It could have been handled a number of ways.

PROSECUTOR: Your Honor I believe counsel has already brought out that the defendant has been arrested and taken into custody. This is after the arrest. Any fingerprinting that the defendant had after the arrest could have this particular item. It's an innocuous term. And I'm not sure because I could not hear counsel, there was no reference to BC.

DEFENSE COUNSEL: Bureau of Identification is different as counsel knows from the – after the arrest of the defendant on this matter. It's completely different.

---

[4]This apparent reference to the Department of Children and Family Services (DCFS) is puzzling. The presentence report does not indicate any juvenile offenses, or prior contacts or involvement with DCFS

THE COURT: I grant you it could have been handled differently. However, the testimony here is that she's doing –

DEFENSE ATTORNEY: No –

THE COURT: – the examination six months after the arrest in this case, so it could be from the arrest in this case for all they know.

DEFENSE ATTORNEY: The problem is DCFS. I still say that it was done wrong, Judge.

THE COURT: Motion for mistrial is denied for that reason."

After the sidebar, the defense attorney cross-examined Ms. Hart and elicited the following testimony about the fingerprint card received from the Bureau of Identification:

"PROSECUTOR: Now, who submitted the first cards from the Chicago Police Department? That was the Chicago Police Department, correct?

HART: The Chicago Police Department actually

> submitted only a card. I believe marked Maribel Jiminez
>
> [the victim]. And then I spoke with a state's attorney who
>
> indicated that there might be a suspect and gave me a
>
> state ID number so I could request a card from the Bureau
>
> of Identification."

The law with respect to database references, such as the one at issue in this case, is well-established. Generally, evidence of other crimes is not admissible unless it is relevant to connect the defendant with the specific crime charged at trial. Jackson, 232 Ill. 2d at 268-69. However, a witness' isolated reference to obtaining defendant's DNA profile or fingerprint card from a database is not reversible error, if (1) necessary to explain the course of the investigation (Jackson, 232 Ill. 2d at 265 (reference to the DNA database was "necessary to explain" defendant's identification years after the offense)); or (2) ambiguous, concerning whether the source of the entry was a prior criminal offense. Jackson, 232 Ill. 2d at 271 ("any inference of past criminal wrongdoing" from testimony that defendant's profile was in a DNA database was purely "speculative"); People v. Jackson, 304 Ill. App. 3d 883, 895 (1999) (same, with respect to fingerprints); People v. Hopkins, 229 Ill. App. 3d 665, 676 (1992) (same, with respect to fingerprints).

31

The reference is considered isolated if "neither direct evidence nor argument at trial" concerns defendant's prior criminal offenses. Jackson, 232 Ill. 2d at 269, discussing with approval People v. Hayes, 139 Ill. 2d 89, 146 (1990),[5] and People v. Lewis, 165 Ill. 2d 305 (1995). For example, in Hayes, our supreme court held that an "isolated statement" was not "so prejudicial" as to require a new trial, where "no direct evidence" of prior criminal conduct was presented at trial. Hayes, 139 Ill. 2d at 146. The Hayes court found no prejudice, although it acknowledged that the witness' prior identification of defendant from a photograph book at a "Violent Crimes" unit "may have raised an inference in the jurors' minds that the defendant had a criminal history." Hayes, 139 Ill. 2d at 146. Similarly, in Lewis, our supreme court found that defendant was not unduly prejudiced by evidence showing that "an FBI fingerprint check" revealed that he was in custody in California. Lewis, 165 Ill. 2d at 345, 347. Defendant was not unduly prejudiced because "the jury heard neither direct evidence nor argument" concerning defendant's other convictions. Lewis, 165 Ill. 2d at 347. See also People v. Jackson, 304 Ill. App. 3d 883, 895

---

[5]Hayes was overruled, but on completely different grounds, by People v. Tisdel, 201 Ill. 2d 210, 219 (2002) (finding that "the Hayes court erred in limiting 'statements of identification' to a witness' actual identification of a defendant").

(1999) (witness' testimony that he obtained defendant's fingerprints from a database was not unduly prejudicial, where the prosecution made no reference to prior arrests, convictions or relations with law enforcement).

In addition to the isolated nature of the statement, an appellate court will consider whether the defense requested a limiting instruction or asked that the jury be informed about sources, besides arrests, for the database in question. Jackson, 232 Ill. 2d at 273-74. For example, in another case, the jury was informed that the fingerprint database included not only arrested individuals, but also police officers and government employees. Jackson, 304 Ill. App. 3d at 895.

In the case at bar, the State does not claim that the reference was necessary to explain the course of the investigation, but rather only that it was ambiguous. With fingerprints, in particular, any connection to a prior crime is speculative at best, since jurors are well aware that fingerprints are required for reasons besides an arrest, such as to obtain a government job. Jackson, 304 Ill. App. 3d at 894-95; Hopkins, 229 Ill. App. 3d at 676 (fingerprinting for employment is "one of the 'common experiences' in life that many jurors have had or know about"). Thus, this court has previously held that "[a] law enforcement officer's isolated and ambiguous statement that he obtained defendant's fingerprints from a state agency's database

33

does not by itself indicate that a defendant has a criminal background." Jackson, 304 Ill. App. 3d at 894, quoted with approval in Jackson, 232 Ill. 2d at 270; Hopkins, 229 Ill. App. 3d at 676.

In the case at bar, any leap in logic from the fingerprint card to a prior offense was even more speculative, since the evidence at trial indicated that the scientist obtained the card, only after defendant was already in custody for this offense. During the sidebar, the trial court ruled that the reference was innocuous, because the scientist received the card after defendant was already in custody, and thus the jury could infer that his custody, in connection with this case, led to the creation of the fingerprint card, rather than some prior case. Instead of requesting a limiting instruction, defense counsel elicited from the scientist a clarification that she received the card from the Bureau of Identification, only after the prosecution already had a suspect, thus further supporting an inference that the card was obtained after defendant's arrest. As a result, the jury was much more likely to conclude that the source of the fingerprint card was defendant's arrest in this case, rather than a prior arrest.

We affirm the trial court's ruling that a mistrial was not required because, first, the remarks were isolated. Defendant does not claim that either direct

evidence or argument at trial concerned his prior offenses. Second, the defense did not seek a limiting instruction or ask that the jury be informed about other sources for the database, but instead chose to elicit clarifying information on cross-examination. Third and most importantly, the connection between a fingerprint card and a prior offense is often tenuous, but it is particularly so where, as in the case at bar, the evidence indicates that the card was obtained after defendant's arrest. Thus, we find no error occurred.

4. Defense Argument of Another Perpetrator

Defendant claims on appeal that the trial court abused its discretion by granting the State's motion in limine to bar the defense from arguing in its closing that Michael Lewis, the father of the murder victim's children, could have committed the charged crimes. The motion was made immediately before closing statements.

On appeal, defendant cites cases for the general proposition that a trial court may exclude a defendant's proposed evidence that another person committed the crime, if the defendant's proposed evidence is remote or speculative. People v. Simmons, 372 Ill. App. 3d 735, 749 (2007); People v. Sykes, 341 Ill. App. 3d 950, 978-79 (2003). However, that is not the issue on appeal. In the case at bar,

defendant did not seek to introduce evidence that the trial court then barred. Instead the issue in this case is what arguments could the defense counsel make from the evidence that had already been admitted.

It is well established that a prosecutor has wide latitude during closing argument. Wheeler, 226 Ill. 2d at 123; Blue, 189 Ill. 2d at 127. Certainly, the latitude afforded the defense counsel cannot be any less. Like the prosecutor, a defense counsel may comment on the evidence and draw any reasonable inferences that the evidence will support. Nicholas, 218 Ill. 2d at 121(discussing what a prosecutor may do). However, a trial court has the discretion to bar a defense counsel from making comments during closing argument that are speculative. People v. Harris, 132 Ill. 2d 366, 391 (1989). Thus, for example, our supreme court upheld a trial court that precluded the defense from making a "speculative" argument during closing. Harris, 132 Ill. 2d at 391. When a trial court places limits on the scope of a defendant's closing, a reviewing court will reverse only if the trial court abused its discretion. Harris, 132 Ill. 2d at 391

In its written motion, the State moved to bar the defense from arguing that the charged crimes could have been committed by either Michael Lewis, who was the father of the murder victim's children, or Orlando Santana, who had been sexually

involved with the murder victim. Ruling in defendant's favor in part, the trial court held that the defense could argue both (1) that Santana could have committed the murder of Jiminez and the attempted murder of Saquimux; and (2) that Saquimux could have committed the murder of Jiminez. The trial court prohibited the defense from arguing only that Lewis could have committed the charged crimes.

During argument on the motion, the trial court asked defense counsel "[w]hat evidence are you relying on that Michael Lewis did this, could have done this?" In response, defense counsel stated only "[t]he initial testimony of the first witness from the State's case," who was Romana Puente, the murder victim's sister. Defense counsel argued that Puente "said in fact on the cross examination that she believed in fact he [Lewis] had slashed the tires [of Jiminez's car], she believed he had hostile acts towards in fact her [Jiminez]."

Despite defense counsel's representation, Puente did not testify that she believed that Lewis had slashed Jiminez's vehicle tires. She testified only that she had "suspicions." Jiminez's testimony that she had her "suspicions" occurred after defense counsel, in a compound question, asked whether Jiminez had problems with Lewis such as "[s]lashing tires, beating [Jiminez] up, [or] hurting her when she's with other men." As a result of the compound question, the record is not clear about

37

exactly what "problems" Puente had her "suspicions."

Specifically, on cross examination, defense counsel asked Puente if she recalled whether Jiminez had problems with her vehicle. Puente responded that she remembered "somebody busting out her window or slashing her tires and busting her windows, but I don't remember when that was." Then defense counsel tried, unsuccessfully, to elicit testimony that Lewis had behaved violently towards Jiminez:

"DEFENSE COUNSEL: And your sister, in fact, had a conversation with you concerning the slashing of those tires, did she?

PUENTE: No, all she told us was that, in fact, her tires were slashed.

DEFENSE COUNSEL: Well, didn't she, in fact, say that she was having problems with the father of her children?

PUENTE: She's always had problems with the father of her children.

DEFENSE COUNSEL: And those problems were

always of a violent nature, correct?  Slashing tires, beating her up, hurting her when she's with other men?

PUENTE: I had suspicions but I didn't know for sure.

DEFENSE COUNSEL: When you say you had suspicions, that's because she would always make excuses for the father of her children and never called the police, correct?

PUENTE: I don't know.

DEFENSE COUNSEL: Well, when you say suspicious, your suspicions was [sic], in fact, that the father of her children had threatened to harm her and, in fact, harmed her property, correct?

PUENTE: But I didn't know for sure.

DEFENSE COUNSEL: Right, you didn't know beyond a reasonable doubt?

PROSECUTOR: Objection.

THE COURT: Objection sustained.

DEFENSE COUNSEL: You didn't know for sure,

correct, but you had your suspicions?

PUENTE: Um-hum.

DEFENSE COUNSEL: I'm sorry, we're going to

have –

PUENTE: I'm sorry.  Yes."

Responding to the defense's argument which was based on the above testimony, the trial court ruled:

"THE COURT:  There is nothing in the record that

is the basis of her belief.  There is nothing in the record

that Michael Lewis is even [within] a thousand miles of

Cook County at the time of this.  No. There is no evidence

that Michael Lewis did anything."

On appeal, the defense cites additional evidence in support of its argument that it did not cite to the trial court, namely: (1) testimony by Tiffany Blake, Jiminez's apartment mate, that Jiminez had tried to reconcile with Lewis and had "recently" slept with him; (2) testimony by Detective Troche corroborating that Blake had told him that Lewis had been at Jiminez's apartment "recently"; and (3)

items of debris recovered from the back porch of Jiminez's apartment on the morning after her murder (People's exhibit No. 74) that included pieces of paper which stated "Michael Lewis and Maribel Jiminez, Best Friends" and "Love you, miss you, want you. Love, Mike."

None of this evidence counters the trial court's concern that the record contains no evidence that Lewis was within "even a thousand miles of Cook County" on the day of the murder. Blake's testimony that Lewis was present "recently" failed to establish any time frame. "Recently" could be one day, one week, one month or more. Similarly, the scraps of paper found on the porch bear no dates. Thus, we cannot find that the trial court abused its discretion when it foreclosed this speculative line of argument. Harris, 132 Ill. 2d at 391 (no abuse of discretion when the trial court foreclosed a "speculative" line of argument from a defense closing).

### 5. Jury's Question

Defendant claims on appeal that the trial court erred by allegedly failing to answer a question from the jury during its deliberations.

"The general rule when a trial court is faced with a question from the jury is that the court has a duty to provide instruction to the jury when the jury has posed

an explicit question or requested clarification on a point of law arising from the facts about which there is doubt or confusion." People v. Millsap, 189 Ill. 2d 155, 160 (2000); People v. Brooks, 187 Ill. 2d 91, 138 (1999). Despite this general rule, a trial court has the discretion not to answer the jury's question "under appropriate circumstances." Millsap, 189 Ill. 2d at 161. To illustrate what constitutes "appropriate circumstances," our supreme court has provided the following examples: (1) "when the instructions are readily understandable and sufficiently explain the relevant law"; (2) "where further instructions would serve no useful purpose or would potentially mislead the jury"; (3) "when the jury's inquiry involves a question of fact"; (4) "where the giving of an answer would cause the court to express an opinion that would likely direct a verdict one way or the other"; or (5) where the court's answer would "submit new charges or new theories to the jury after the jury commence[d] its deliberations." Millsap, 189 Ill. 2d at 161.

An appellate court may find an abuse of discretion either where the trial court refused to answer an appropriate question; or where the trial court chose to answer, in the face of "appropriate circumstances" that warranted restraint. Millsap, 189 Ill. 2d at 163 (trial court's answer was an abuse of discretion).

In the case at bar, the jury sent out two notes on the second day of jury

42

deliberations. The first note stated: "We'd like to request Tiffany's and Detective

Conley's testimony, also Detective Troche." Both parties agreed that the jury

should receive all three transcripts when all three became available.

The second note stated:

"We'd like to request <u>Joan Kuruc's testimony</u>.

Legal question: In 1999 was it possible for the suspect to

write out their own statement instead of

having it taken down for them.

In 1999, was it possible for a detective to

take a signed confession instead of

waiting for a district attorney."

(Emphasis in original.)

In response to the request for transcripts, the trial court stated that it would

instruct the jury: "The transcripts you have requested will be available in

approximately one hour. At that time they will all be provided to you." The defense

objected to naming a precise time, but the trial court overruled this objection.

However, this objection is not at issue on appeal.

In response to the "legal question[s]" in the second note, the trial court wrote

by hand on the bottom of the note:

> "You have heard the evidence and have been
>
> instructed as to the law. Please continue your
>
> deliberations."

Defense counsel objected, arguing that the trial court should answer both questions in the affirmative. Defense counsel stated: "by not answering it, the Court is directing the verdict in the State's favor." The trial court overruled the objection. It is the trial court's ruling on this objection that defendant appeals.

The "evidence" referred to by the trial court in its above response was, in part, the testimony of the assistant State's Attorney who reduced defendant's statement to writing. On direct examination, she testified that she offered defendant three options to memorialize his statement: (1) that the assistant State's Attorney could write down the substance of what defendant told her, and then defendant would have an opportunity to review what she had written and to make changes; (2) a court reporter could transcribe, word for word, the assistant State's Attorney's questions and defendant's answers; and (3) a videographer could film her questions and his answers. The assistant State's Attorney testified that defendant chose the first option.

44

No. 1-07-2222

During cross-examination, defense counsel questioned the assistant State's Attorney about why defendant was not offered a fourth option, namely the option of writing his own statement:

"DEFENSE COUNSEL: Have you ever let a defendant write out their own statement?

WITNESS: Absolutely not.

DEFENSE COUNSEL: When you say absolutely not, that is, in fact the – Well, let me ask you. Why do you say absolutely not?

PROSECUTOR: Objection.

THE COURT: Overruled. You may answer.

WITNESS: Why did I not let a defendant write his own statement out?

DEFENSE COUNSEL: In his own words.

PROSECUTOR: Objection.

THE COURT: Overruled. You may answer.

WITNESS: The statement I reported is in his own words. Anytime a handwritten statement is taken —

45

DEFENSE COUNSEL: Motion to strike as unresponsive.

THE COURT: She hasn't finished her answer yet.

DEFENSE COUNSEL: I'm sorry. Finish your answer.

WITNESS: The statement itself is going to become evidence. The assistant state's attorney writes it in the presence of the person speaking, whether it's a witness or a defendant or a suspect. I've never, never asked a defendant to write his own statement.

DEFENSE COUNSEL: Motion to strike as unresponsive. The question was why.

THE COURT: Well, overruled. That answer may stand. You may continue, if you wish.

DEFENSE COUNSEL: Well, now do you understand I asked you why don't you let them write it in their own words?

WITNESS: This statement is in his own words, the

46

statement that I took.

DEFENSE COUNSEL: So he referred to himself in the third person?

WITNESS: No, he did not."

In the above colloquy, defense counsel did not ask the assistant State's Attorney if there was a law that prevented her from asking defendant to write down his own statement or if there was a law that prevented the detective, who first heard defendant's statement, from writing it down. In essence, the jury note was asking the trial court to fill in the blanks left open by the defense's cross-examination. Simply put, the jury was asking for additional evidence.

The defense had two opportunities to fill in these blanks, first when the assistant State's Attorney testified, and later during the testimony of the detective who initially received defendant's statement. However, the defense also chose not to ask the detective if any law or protocol prevented him from writing it down. During the cross-examination of the detective, the defense elicited the following information:

"DEFENSE COUNSEL: But the things that he was telling you and [your partner] which you say he said, you

47

did not write those down and have him sign off on those, correct?

DETECTIVE: No, I write that stuff in my G.P.R.'s and notes, he doesn't sign my notes.

DEFENSE COUNSEL: Did you show him your notes?

DETECTIVE: No.

DEFENSE COUNSEL: You didn't say I want to make sure I have this right, read this over, correct?

DETECTIVE: That's correct.

DEFENSE COUNSEL: You didn't say Mr. Maldonado, I want to put this in your own words, here is a pencil, here is a paper, write this down?

DETECTIVE: No, we don't do that."

Later during the cross-examination of the detective, defense counsel elicited that the standard protocol of the Chicago Police Department with respect to statements had changed. However, defense counsel chose not to ask what it had changed from:

> "DEFENSE COUNSEL: And this in fact is before the continuous video taping of interrogations took place re[:] the Chicago Police Department?
>
> DETECTIVE: What is now their standard operating procedure, yes."

By noting that defense counsel chose not to ask what the law or protocol was in 1999, we intend no criticism of counsel. Counsel may have had valid strategic reasons for not asking. In fact, in the defense closing, defense counsel exploited this ambiguity by arguing:

> "First of all, if you're going to take a true statement, do you want me interpreting your words, do I want you interpreting your words. No. I want to put down in my own words what I want to say. Ask the State's Attorney, was he allowed to do that. No. Why? I don't know. That's their procedure. That's why they're called the prosecution. They had him and wanted to prosecute him."

In Brooks, our supreme court held that a trial court's answer was not an abuse of discretion, where "the trial judge accurately repeated [a witness']

testimony, which the jury heard earlier that day." Brooks, 187 Ill. 2d at 138. By contrast, in the case at bar, there was no testimony that the trial court could have repeated to answer the jury's question. Defendant has not cited us a case, nor can we find one, that permits a trial court, after the close of evidence and closing arguments, to fill in evidentiary blanks left by a party. Thus, we find that the trial court's answer was not an abuse of discretion.

### 6. Fines and Fees

Defendant claims that he is entitled to a $15 reduction in the costs and fees that he was ordered to pay; and the State agrees. For the reasons discussed below, we order defendant's fines and fees reduced by $15 from $895 to $880, and order that his mittimus be corrected accordingly. E.g. People v. Cleveland, 393 Ill. App. 3d 700, 715 (2009) (ordering that defendant's fines and fees be reduced by a certain amount and that "his mittimus be corrected accordingly").

Specifically, defendant claims that he is entitled to a monetary credit that should be offset against certain fees ordered by the trial court. In an order dated June 4, 2007, the trial court directed defendant to pay $895 in various court costs and fees. On appeal, defendant does not dispute the assessment of these costs and fees. Instead, defendant claims that, pursuant to section 110-14 of the Code of

No. 1-07-2222

Criminal Procedure of 1963 (725 ILCS 5/110-14 (West 2006)), he is entitled to a credit of $5 per day for the 2,804 days that he spent in custody, between his arrest and sentencing. People v. Caballero, 228 Ill. 2d 79, 88-89 (2008) (credit pursuant to section 110-14 applies anytime a person is incarcerated between arrest and sentencing); People v. Rivera, 378 Ill. App. 3d 896, 898-900 (2008).

### a. Amount of Available Credit

Section 110-14 of the Code of Criminal Procedure of 1963 is entitled "Credit for Incarceration on Bailable Offense" and it provides in full:

> "(a) Any person incarcerated on a bailable offense who does not supply bail and against whom a fine is levied on conviction of such offense shall be allowed a credit of $5 for each day so incarcerated on application of defendant. However, in no case, shall the amount so allowed or credited exceed the amount of the fine.

> (b) Subsection (a) does not apply to a person incarcerated for sexual assault as defined in paragraph (1) of subsection (a) of Section 5-9-1.7 of the Unified Code of Corrections." 725 ILCS 5/110-14 (West 2006).

51

According to section 110-14, the amount of the available credit is calculated by multiplying $5 by the number of days of incarceration. 725 ILCS 5/110-14 (a) (West 2006). During sentencing, the trial court calculated that defendant was entitled to a credit against his term of imprisonment of 2804 days. Multiplying $5 by this number of days yields a total of $14,020.

### b. Fine

Section 110-14 specifies that this credit is available only against a "fine." On appeal, defendant argues that the mental health vourt fee (55 ILCS 5/5-1101 (d-5) (West 2006) and the youth diversion/peer court fee (55 ILCS 5/5-1101(e) (West 2006)) qualify as fines, and that they should be offset against the $14,020 credit. In People v. Price, 375 Ill. App. 3d 684 (2007), this court held that these particular fees were appropriately characterized as "fines" where there was "no relevant connection between the offense committed by defendant and mental health or juvenile justice." Price, 375 Ill. App. 3d at 700; People v. Jones, 223 Ill. 2d 569, 600 (2006) (a charge is a fine, despite the legislature's label of it as a fee, if it "does not seek to compensate the state for any costs incurred as the result of prosecuting the defendant"). In Price, we found no relevant connection between the weapons charge at issue in that case on the one hand, and mental health and juvenile justice

on the other. Price, 375 Ill. App. 3d at 700. We therefore held that, in that particular case, the charges were actually fines, despite being labeled as " 'fee[s]' " by the legislature. Price, 375 Ill. App. 3d at 700. Similarly, in the case at bar, these charges, although labeled as "fees" on the trial court's order, are also fines, for the same reason: there is no relevant connection between the murder and attempted murder offenses committed by defendant on the one hand, and mental health and juvenile justice on the other. Thus, they are the type of fees that are eligible for an offset against the credit.

The written order of costs and fees entered against defendant on June 4, 2007, indicates a $10 charge for "Mental Health Court" and a $5 charge for "Youth Diversion/Peer Court." Thus, even though defendant has a much larger credit, defendant's appeal asks for only a $15 reduction in the costs and fees that he was ordered to pay.

## c. Bailable Offense

Section 110-14 provides that the credit is available only when a person is incarcerated "on a bailable offense." 725 ILCS 5/110-14 (West 2006). Since the statute is limited to bailable offenses, there must also be nonbailable offenses for purposes of this statute. Otherwise, this limiting language would be superfluous;

and a statute must be interpreted so that no part of it is rendered meaningless or superfluous. Jones, 223 Ill. 2d at 581 ("We construe statutes as a whole, so that no part is rendered meaningless or superfluous").

What is, and what is not, "a bailable offense" is defined in section 110-4 of the Code of Criminal Procedure. 725 ILCS 5/110-4 (West 2006); Ill. Const. 1970, art. I, §9 (amended in 1986 to expand the list of nonbailable offenses); Rivera, 378 Ill. App. 3d at 900 (to define the term "bailable offense" for purposes of section 110-14, a court must look to section 110-4). Section 110-4 is entitled "Bailable Offenses," and it provides that "[a]ll persons shall be bailable before conviction" with the exception of certain categories of offenses. 725 ILCS 5/110-4 (West 2006); Rivera, 378 Ill. App. 3d at 900 (noting "the exception of five categories of offenses").

The listed categories of offenses include: (1) capital offenses; (2) offenses eligible for life imprisonment; (3) felony offenses requiring imprisonment without conditional and revocable release; (4) stalking offenses; and (5) weapons offenses at or near a school or on a school conveyance. 725 ILCS 5/110-4 (West 2006). In 2008, the section was amended to add a sixth category: (6) terrorism offenses. Pub. Act 95-052, eff. August 29, 2008.

Of these listed categories, the two which pertain to the case at bar are: (1) capital offenses; and (3) felonies without conditional release. The case at bar was a capital case from October 1, 1999, when defendant was arrested, until April 29, 2007, when the State declared it would not seek the death penalty. On October 6, 2004, defendant filed a motion to declare defendant ineligible for the death penalty due to mental retardation; and on April 4, 2005, the motion was denied. On April 29, 2007, the State filed a notice of intent not to seek the death penalty.

After April 29, 2007, this case switched from the first category of capital offenses to the third category of felonies without conditional release.[6] The crimes with which defendant was charged, first-degree murder and attempted first-degree

---

[6]Defendant's offenses did not qualify for the second category, offenses eligible for natural life imprisonment. For defendant's first-degree murder conviction to be eligible for natural life imprisonment, the State would have had to allege and prove "wanton cruelty" or an aggravating circumstance, which it did not. 730 ILCS 5/5-8-1 (a) (1) (b) (West 2006). As a result, for the first-degree murder conviction, defendant had to receive "a determinate sentence set by the court" that was "not less than 20 years and not more than 60 years." 730 ILCS 5/5-8-1 (a) (1) (a) (West 2006).

murder, are both felony offenses requiring imprisonment, which are not eligible for conditional discharge. 730 ILCS 5/5-5-3(c)(2) (A) (West 2006) ("First degree murder where the death penalty is not imposed"), (B) ("Attempted first degree murder").

With respect to these two categories, section 110-4 states in relevant part:

"All persons shall be bailable before conviction, except the following offenses where the proof is evident or the presumption great that the defendant is guilty of the offense: [1] capital offenses; *** [3] felony offenses for which a sentence of imprisonment, without conditional and revocable release, shall be imposed by law as a consequence of conviction, where the court after a hearing, determines that the release of the defendant would pose a real and present threat to the physical safety of any person or persons [.]" 725 ILCS 5/110-4 (a) (West 2006).

For offenses to be nonbailable, they must fall into one of the listed categories,

and the proof must be "evident or the presumption great" that defendant was guilty.[7] 725 ILCS 5/110-4 (a) (West 2006). For the third category, there is an additional requirement, that "the court, after a hearing, determine that the release of the defendant would pose a real and present threat to the physical safety of any person or persons." 725 ILCS 5/110-4(a) (West 2006).

In People v. Purcell, 201 Ill. 2d 542 (2002), our supreme court upheld the validity of subsections (a) and (c), while placing the burden of proof under these two sections squarely on the State. Purcell, 201 Ill. 2d at 549-52.[8] In the case at bar, defendant was granted bail, which means that the state either failed or did not attempt to satisfy its burden. For this reason, we find that defendant's offenses

---

[7]However, courts have held that an offense can still qualify as a bailable offense even after a defendant is found guilty. E.g., Rivera, 378 Ill. App. 3d at 899-900, citing People v. McNair, 325 Ill. App. 3d 725, 726 (2001), People v. Smith, 258 Ill. App. 3d 261, 268-69 (1994), People v. Bennett, 246 Ill. App. 3d 550, 551-52 (1993), and People v. Raya, 250 Ill. App. 3d 795, 802-03 (1993),

[8]The version of the statute discussed in Purcell (725 ILCS 5/110-4 (West 2000)) is identical to the version of the statute discussed in our opinion (725 ILCS 5/110-4 (West 2006)).

qualified as bailable offenses, and thus defendant was entitled to the credit described in section 110-14 (725 ILCS 5/110-14 (a) (West 2006)).

CONCLUSION

In sum, we find, first, that the trial court did not abuse its discretion by overruling defense objections to the admission of 23 crime scene and morgue photographs that depicted the victim's body. A careful review of each photograph convinced us that their probative value outweighed any unfair prejudice. The 10 morgue photographs were not particularly gruesome, since they had been cropped to show only discrete parts of the body, and most of the wounds had been cleaned, making them appear practically bloodless. Several of the crime scene photographs showed the victim's apartment from different angles and perspectives, with only portions of the victim's body visible. Although a number of the crime scene photographs were gruesome, they were highly probative in portraying the event.

Second, under either an abuse of discretion or a de novo standard of review, we find that the trial court did not err by overruling a defense objection to a remark during the State's closing that defendant's brother "knew." One highly ambiguous remark in the State's closing is not enough to warrant a mistrial or to create substantial prejudice to a defendant.

58

Third, the trial court did not abuse its discretion by overruling a defense objection to testimony by a forensic scientist that he had received defendant's fingerprint card from the Bureau of Identification. No direct evidence or argument at trial concerned his prior offenses. In addition, the defense did not seek a limiting instruction or ask that the jury be informed about other sources for the database, but instead chose to elicit clarifying information on cross-examination. Last and most importantly, the connection between a fingerprint card and a prior offense is often tenuous, but it is particularly so where , as in the case at bar the evidence indicates that the card was obtained after defendant's arrest.

Fourth, the trial court did not abuse its discretion by granting the State's motion to bar the defense from arguing during its closing that the father of the murder victim's children could have committed the charged crimes. Although defendant cited evidence to support its theory, none of it countered the trial court's concern that the record contained no evidence that the father was within "even a thousand miles of Cook County" on the day of the murder.

Fifth, the trial court did not abuse its discretion by telling the jury that they had "heard the evidence" in response to a jury question. The jury question had asked whether it was possible for either a police detective or the defendant himself

to write out the defendant's confession. While defense counsel had cross-examined the assistant State's Attorney about why defendant had not written out his own statement, counsel had chosen not to elicit the particular information requested by the jury. In essence, the jury note was asking the trial court to fill in the blanks left open by the defense's cross-examination. Defendant did not cite us a case, nor could we find one, that permits a trial court, after the close of evidence and closing arguments, to fill in evidentiary blanks left by a party.

Sixth, defendant was entitled to the monetary credit described in section 110-14 (725 ILCS 5/110-14 (a) (West 2006)), since his offenses were bailable offenses. We order defendant's fines and fees reduced by $15 from $895 to $880, and order that his mittimus be corrected accordingly.

For the foregoing reasons, we affirm the conviction and order a $15 reduction in defendant's fines and fees.

Affirmed with instructions.

McBRIDE and GARCIA, JJ., concur.