2018 IL App (1st) 152067

No. 1-15-2067

Opinion filed December 11, 2018

Second Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS,

    Plaintiff-Appellee,

v.

TIMOTHY HERRING,

    Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Appeal from the Circuit Court
of Cook County.

No. 11 CR 197

The Honorable
Mary Margaret Brosnahan,
Judge, presiding.

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Presiding Justice Mason and Justice Pucinski concurred in the judgment and opinion.

**OPINION**

¶ 1    Stephen Peters discovered that someone had broken into his mother's garage and damaged his prized Ford Mustang. Stephen called the police. An evidence technician arrived to collect fingerprints and other evidence. While the two men stood in the alley outside the garage, they were shot and killed. A few days later, friends and relatives of Timothy Herring informed police that Herring had committed the murders. A jury convicted Herring of first degree murder of both men.

¶ 2      Herring argues (i) the State did not prove the *corpus delicti* of the offense due to insufficient evidence (Herring, however, misunderstands the *corpus delicti* rule); (ii) the trial court erred in making several evidentiary rulings (but these rulings either do not constitute an abuse of discretion or were harmless error); (iii) the State committed prosecutorial misconduct in several ways (we find, however, that none presents reversible error); (iv) his trial counsel was ineffective for failing to object to fingerprint evidence and cell phone location data (but Herring's counsel attacked the fingerprint evidence through cross-examination and, even if the cell phone location data had been excluded, no reasonable probability exists that it would have led to an acquittal); and (v) his mandatory natural life sentence is unconstitutional (but the law sees Herring as an adult, not a juvenile, at the time of the murders).

¶ 3                       Background

¶ 4      Herring moved to prevent the State from eliciting hearsay statements that Stephen had made to his mother before his death and her 911 call. The trial court admitted Stephen's statements to Laura Peters to explain his intent to go back to the garage and admitted the 911 call as an excited utterance to establish the chain of events and as evidence of the second set of gunshots. The trial court said it would consider giving a limiting instruction about Stephen's statements.

¶ 5                       Laura Peters

¶ 6      Laura's son, Stephen, kept his 2003 Ford Mustang in the garage behind her home. In the early afternoon of November 26, 2010, Stephen came to her house and told her that someone had broken into the Mustang, he had called the police, and he was going outside to await their arrival. (The trial court overruled Herring's objection to this testimony. Herring did not request a

limiting instruction.) About 10 minutes later, Laura heard two gunshots outside. She looked out the back window and saw Stephen lying on the ground.

¶ 7        Laura called 911 and reported that Stephen had been shot. Whiles on the phone, she heard two more shots. The State played a tape of the 911 call for the jury. (The trial court overruled Herring's objection to the tape.) When Laura looked out the window, she saw a man pushing two garbage cans in front of the garage. The cans had her home address spray-painted on them). She described the man as dark complected; 5 feet, 8 inches; wearing dark jeans and a dark hooded jacket with the hood pulled up.

¶ 8                                         Will Turner

¶ 9        Will Turner's garage sits directly across the alley from Laura's garage. At 1:15 p.m., Turner came home with a friend and pulled into the alley. Turner saw a police car parked in the alley by his garage and asked Stephen what had happened. Stephen told Turner that someone had broken into his mother's garage, and he thought that person would return for the stolen items, which had been stashed in garbage cans next to the garage. (The trial court overruled Herring's objection to this testimony.) Turner went into his house while his friend went into Turner's garage. A few minutes later, the friend knocked on Turner's door and told him that someone was shooting in the alley. Turner looked out and saw Stephen and a police officer lying on the ground. Turner told his friend to call 911. Then, Turner heard two gunshots. Turner did not see who fired and did not see Herring, who he knew because Herring lived nearby.

¶ 10                                      Rahman Muhammad

¶ 11        The first officer to arrive, Chicago police sergeant Rahman Muhammad, saw Stephen lying on the ground, then noticed Chicago police officer Michael Flisk and radioed that an officer had been shot. Officers swiftly arrived and searched for the two garbage cans that had been

moved from the alley. They located the cans in the backyard at 8112 South Burnham, about eight or nine houses from Laura's home. The cans contained wires and car stereo equipment. The backyard was open and accessible to anyone from the alley.

¶ 12                                     Fingerprint Evidence

¶ 13        Police evidence technicians processed the contents of the garbage cans (which contained several items other than those from Stephen's car). All items were dusted for fingerprints, but only one latent print was found, on a rearview mirror bracket. A fingerprint examiner determined that this fingerprint matched Herring's left index finger. The examiner admitted that in writing his report, he initially gave the wrong inventory number for the mirror bracket, but corrected his error before trial. Herring's counsel cross-examined the fingerprint examiner, and did not object to the mirror bracket's admission. No fingerprint taken from Stephen's car matched Herring.

¶ 14                                     Tranay Smith

¶ 15        In the late morning of November 26, Tranay Smith, an acquaintance of Herring's, received a call from him. Smith was with her friend and cousin, Diamond Owens. Smith and Owens picked up Herring and went to Smith's home at 83rd Street and Phillips Avenue. The three smoked marijuana and watched television before dropping Herring at 81st and Muskegon. Smith drove around the neighborhood for about a half hour and saw police officers near 80th and Manistee. Smith called Herring to check on him because she knew Herring was on parole. Herring asked Smith to pick him up in an alley at 81st and Muskegon. When she arrived, Herring appeared to be acting paranoid but told Smith nothing was wrong.

¶ 16        They all returned to Smith's house. Herring began panicking and asked Smith if anyone else was home and whether police cars had cameras. Herring said that he had shot two people. Herring began cutting off his braided hair and making phone calls. He took off his jacket, and

Smith saw there were colored wires in it. He had a black gun with a laser beam. He put the gun, the jacket, the wires, and braids in a bag, and then the bag into a diaper box in Smith's closet. Herring told Smith not to say anything and that Tim Willis would retrieve the bag. Herring wanted a haircut, so Smith took him to a barbershop at 79th Street and Kingston Avenue. Later that night, Willis came to Smith's home and took the bag.

¶ 17 Smith did not call the police; rather, the police took her to the station and read her the Miranda warnings. At first, Smith lied and said she had only wanted to buy marijuana from Herring; but her conscience bothered her, and she knew that Herring was in jail at that point, so she disclosed what Herring had told her. She was not allowed to return home until after making a taped statement. Smith had an unrelated felony charge pending at the time.

¶ 18 The police never recovered any of the items Herring placed in Smith's closet.

¶ 19         F. Diamond Owens

¶ 20 Owens, Smith's cousin, had been scheduled to testify the week before but had refused, and was now in sheriff's custody. On November 26, Owens was with her cousin, Smith, when Smith received a call from Herring, whom Owens did not know. Smith and Owens picked up Herring and went to Smith's house; later, the two women drove Herring to 81st and Manistee. Driving around afterwards, Owens and Smith saw police in the area, and Smith called Herring. Smith drove to an alley near 81st and Muskegon, and Herring, who looked "very shaken and scared," got in the car. On the way back to Smith's house, their car passed the alley at 81st and Manistee. Owens saw a police car and two people lying on the ground.

¶ 21 At Smith's house, Herring pulled a gun from his jacket and put the jacket and gun in a bag, telling them he had shot two people. The gun was gray with a red laser beam. Owens left the room; when she returned, she saw braids on the floor. Smith put the hair in the bag, and Herring

asked the women to drive him to a barber. They left him at a shop at 79th and Kingston. Later that evening, Smith gave the bag containing the gun to someone who came to the house.

¶ 22    Owens's father took her to the police station. Initially, Owens did not tell the police the truth, fearing her father might learn about her involvement. In a second interview, hours later, after police disclosed they had spoken with Smith, Owens told them what she knew.

¶ 23                                    Raynard Jackson

¶ 24    On November 26, a man came into the barbershop where Raynard Jackson worked. The man had braids and asked for a haircut. Jackson told the man he would need to take the braids out, and the man left. Jackson had not wanted to talk to the police, but he identified Herring from photographs. Jackson did not know Herring and saw him for a few seconds.

¶ 25                                    Tekeyina Poole

¶ 26    Tekeyina Poole, a longtime friend of Herring's, received a call from him at 2:30 p.m. Shortly afterward, Herring arrived at her home. He had on a red fitted hat that Poole had never seen. Herring stayed for about an hour, receiving several calls. At 3:50 pm, Herring called his cousin, Moesha Menzies, and asked her to come get him. When Menzies arrived, Herring left.

¶ 27                                    Moesha Menzies

¶ 28    Menzies, another cousin of Herring's, lived down the street from Herring. She knew Stephen (nicknamed "Sweet Pea") because he parked his Mustang in a garage across the alley. At 3:00 p.m. on November 26, she learned about the shooting from a Facebook message and wondered if Herring might be responsible. During the summer, Herring had told her that he wanted to take the Mustang's speakers. Herring called and asked her to meet him at 80th and Saginaw. As Menzies and Herring walked home, she asked him what was going on, and "he told me he did it. *** he just told me he shot them." Herring did not say who he shot or explain his

actions. Herring told her that the victims told him that they had obtained fingerprints from the car and the prints would provide whatever they needed to know. Herring told her that he shot both men twice and ran.

¶ 29 Menzies was impeached with her videotaped statement to an assistant state's attorney, in which she gave additional details. She had been told by Herring that the two men were "Sweet Pea and a guy in a uniform" and "he seen the two guys while he was in the gangway and he seen them taking fingerprints." Menzies also said that Herring told her he walked up and told Stephen that he knew who had stolen his speakers. Herring turned his back and pulled out his gun, turned around, shot, and ran down the alley; he came back and saw Stephen still moving. He shot both men again.

¶ 30 After this conversation, Menzies called her sister, Ebony Garrett, and the two went for a walk. She told her sister what Herring had said, and Ebony was shocked. Later, police picked up Menzies, and took her to an interrogation room. Menzies at first told police she knew nothing, but the police told her that Ebony said Menzies did know, and threatened Menzies with a lie detector test. Menzies gave a recorded statement after learning her sister had talked to the police. Before being released, Menzies made a statement. She testified before the grand jury the next day. Menzies obtained her own attorney because, she claimed, the police and the state's attorney were hounding her. The State impeached her with her grand jury testimony, in which she reported good treatment and denied threats.

¶ 31                                    J. Ebony Garrett

¶ 32 Ebony, Menzies's sister, knew Stephen from the neighborhood and learned of the shooting on November 26. She denied talking to Menzies about the shooting. She was currently

in jail for failing to appear to testify. She denied she planned to collect a reward for testifying. Nothing in the record indicates that a reward was paid.

¶ 33    The State tried to impeach Ebony with her previous statements to the police and the grand jury. The trial court ruled that her statement to the police was admissible only as impeachment evidence but her grand jury testimony could be admitted as substantive evidence since it was given under oath at a proceeding. Before playing the video of her statement to police, the trial court instructed the jury that "whatever Moesha Menzies told [Ebony] Garrett who is now on the screen, that is not being offered for the truth of the matter asserted. It's simply being offered to impeach [Ebony] Garrett's testimony. And as you recall yesterday, she said 'I don't recall' to the majority of the questions. So it's for impeachment purposes only."

¶ 34    The State repeatedly impeached Ebony with her statement to the police and her grand jury testimony. In the statement and testimony, she admitted she spoke to Menzies after Menzies had learned from Herring that he killed two men. She was told by Menzies that Herring was trying to take Stephen's speakers when Stephen and a police officer arrived and Herring shot them to avoid returning to prison. Herring shot Stephen in the head and left, then came back and saw Stephen still moving and shot the victims again. Herring gave the gun to a girl who picked him up. After hearing this story, Ebony used her mother's phone to call Herring and asked if it was true. He acknowledged that it was. Ebony asked why he shot the men; Herring said he didn't want to return to prison.

¶ 35    Late on November 26, or early the next morning, Melvin Johnson (who was dating Ebony's sister, Ashley Garrett) asked Ebony if she knew anything about the shooting. She told him she knew who did it. The next morning, Johnson brought her a flyer offering a $10,000 reward for information on the shooting. Ebony told her sister and Johnson what she heard from

Menzies. Ashley wanted to turn Herring in, but Ebony didn't because one of her friends had been murdered earlier in the year and the police had not investigated or offered a reward to solve that crime. Ashley called the number on the flyer and confirmed the reward. She arranged a meeting, and left with Johnson. Later, police came to talk to Ebony, and she gave a statement knowing her sister had done so.

¶ 36                                              Melvin Johnson

¶ 37          Johnson testified that he lived at 81st and Manistee with his girlfriend, Ashley Garrett, and knew of Herring. Johnson had not shown up for his original scheduled testimony and had a contempt charge pending. According to Johnson, on the night of November 26, he was at Ashley's house when Ebony told them about the shooting. Ebony was timid and scared.

¶ 38          The next day, Johnson saw a flyer offering the reward for information about the shooting. He discussed it with the Garrett sisters, and Ashley called the phone number on the flyer to arrange a meeting. Johnson and Ashley went to the police station and gave a statement. Johnson was told that the reward could be as high as $20,000. They originally planned not to bring Ebony into it. Her role, however, came out during his interview. Johnson remained at the station for 12 hours and did not want anyone to know that he had helped the police.

¶ 39                                              Ashley Garrett

¶ 40          On November 26, Ashley saw the shooting on the news. Later that night, she spoke to Johnson about what her sister had told him. The next day, Johnson brought the reward flyer to Ashley, and they discussed it with Ebony. Ashley called the police, then she and Johnson went to the police station. She spent many hours in the interrogation room before giving a video statement. She denied needing the reward money and did not remember calling to confirm the

amount. The State impeached her with an earlier statement in which she said that, before providing information, she confirmed the reward.

¶ 41                                     Cassandra Riddley

¶ 42        Cassandra Riddley had briefly dated Herring that summer, reconnecting with him in November. On November 26, the two talked and Riddley began driving to Herring's home, only to be stymied by police presence in the area. Riddley parked and walked there. Riddley asked Herring what happened. Herring admitted to killing two police officers but not why. Herring wore a skullcap and told Riddley he had cut his hair. Riddley left but texted Herring at 6:30 p.m. to ask "what about the clothes?" Herring replied, "gone." On November 30, police visited Riddley. At first she denied she knew anything, but the police accused her of lying and took her to the station for several hours of interrogation. She was scared and did not want to be charged. After the police told her they had phone records showing she spoke with Herring on November 26, Riddley told them what she knew.

¶ 43                                     Cell Phone Evidence

¶ 44        Detective Timothy Murphy, while investigating the case, obtained Herring's cell phone number. Murphy made an "exigent circumstances" request to Sprint for Herring's cell phone records. Murphy did not get a warrant. Murphy compiled a list of people linked to Herring's phone number (including Ashley, Ebony, Johnson, Menzies, and Poole). Later that evening, after an arrest warrant had been issued for Herring's parole violation, Murphy acquired a warrant to search Herring's residence and seized his phone and computer. The State also received cell site location information showing the location of Herring's cell phone over the course of the previous days, but the record does not indicate whether the police received this information under the "exigent circumstances" request or from Herring's phone.

¶ 45        The State submitted Herring's phone records, showing every incoming and outgoing call and text message, including duration, around the time of the shooting. The records included phone numbers linked to Ebony, Menzies, Owens, Poole, Riddley, Smith, and Willis. Most calls were short. And the records did not reveal if Herring was using his phone or had conversed, left a message, or hung up.

¶ 46        The phone records also showed which cell phone towers connected with Herring's phone. An Federal Bureau of Investigation agent testified that, though he was unable to pinpoint the specific address of Herring's phone during this time, the cell phone tower records showed Herring in the vicinity of the shooting when it occurred. The agent admitted, however, this also accorded with Herring's phone being at his own home, which was near the crime scene. Herring's counsel did not object to this testimony.

¶ 47                                      Herring's Behavior in Custody

¶ 48        Herring was taken to the police station on the afternoon of November 27 and placed in an interview room. Detective James Carlassare testified that he saw Herring stand on a bench in the interview room and try to push up the ceiling tiles and climb into the ceiling. Carlassare cuffed Herring to the wall. The State moved to admit a 15-minute video showing Herring pushing up the ceiling tiles, arguing that it showed consciousness of guilt. The defense objected, arguing that though the State had tendered a videotape of Herring's entire stay in the interview room, it had not disclosed its intention to show this particular portion. The trial court overruled the objection, holding that since the State had given the defense the entire tape in discovery, it need not disclose its intent to use any specific portion. Detective Carlassare admitted that, at the time Herring pushed up the ceiling tiles, Herring had been in the interview room for 27 hours; Herring

knew he was being taped because he waved at the video camera. Herring was never charged with attempted escape.

¶ 49      In addition, the State submitted recordings of Herring's phone calls from the Cook County Jail. In them, Herring speculated that he would be acquitted should Smith not testify against Willis, and that he knew the police hadn't found the gun. (The State did not present a transcript of the calls to the trial court or jury.)

¶ 50      The trial court instructed the jury that "any evidence that was received for a limited purpose should not be considered by you for any other purpose." The trial court also instructed the jury that a witness could be challenged with a prior inconsistent statement, and this statement could be considered as substantive evidence if made under oath.

¶ 51                                    Closing Argument

¶ 52      The State noted Stephen's hearsay statements and played the tape of Laura's 911 call for a second time. In rebuttal, the State argued that Laura "has suffered enough," and that "the Peters family does not need his executioner to speak for him. That's beyond belief. That's disgusting." In response to defense argument that State witnesses had implicated Herring to receive a reward, the State argued "So now the grand jury, the individual grand jurors, are part of the conspiracy as well." The defense attorney objected, but the State continued "that's nuts." The objection was sustained, but the State continued "that's beyond nuts." In discussing Herring's friends and family who had implicated him, the State argued that they initially lied to the police for "self preservation," asking how they could "be safe from [Herring]."

¶ 53      The jury convicted Herring of both first degree murder and burglary. The trial court denied Herring's motion for a new trial, which argued (i) the evidence did not prove him guilty beyond a reasonable doubt, (ii) the trial court erred in admitting hearsay testimony from Stephen

and his mother, and (iii) the State's closing argument was improper. Because Herring had been convicted of first degree murder of two victims, the trial court sentenced him to a mandatory term of natural life imprisonment. The trial court noted that it would have given Herring a severe sentence even if the natural life sentence had not been mandated. The trial court denied Herring's motion to reconsider his sentence.

¶ 54                                     Analysis

¶ 55                     The State Did Not Violate the *Corpus Delicti* Rule

¶ 56        Herring first argues that his confession is inadmissible because the State failed to establish the *corpus delicti* of the crime with independent evidence. Essentially, Herring asserts that the State did not have evidence of his guilt other than his statements to his friends that he had committed the crime. Herring both misapplies the rule and discounts the other evidence tending to corroborate his guilt.

¶ 57        The "*corpus delicti*" of an offense "is simply the commission of a crime." *People v. Lara*, 2012 IL 112370, ¶ 17. It is one of the propositions the State must prove beyond a reasonable doubt. *Id.* To prove the *corpus delicti*, the State must provide evidence independent of a defendant's confession. *Id.*

¶ 58        The *corpus delicti* rule exists because we generally mistrust out-of-court confessions, knowing that these statements can be coerced or otherwise unreliable. *Id.* ¶ 19. We do not want a defendant to be convicted of a nonexistent crime. This rule would apply to a murder case where there is no body or a question as to whether the deceased had been murdered as opposed to dying from natural causes. Stephen and Flisk were murdered. This was easily proved through the testimony of eyewitnesses who heard two sets of gunshots and saw the bodies, along with the medical evidence that both men died of gunshot wounds.

¶ 59    The State also needed to prove that Herring committed the crime. A challenge to the sufficiency of the evidence involves, after viewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Campbell*, 146 Ill. 2d 363, 374 (1992). As a reviewing court, we will not substitute our judgment for that of the trier of fact on questions concerning the weight of the evidence or witness credibility. *Id.* at 375. We will reverse a criminal conviction, however, should the evidence be so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt. *Id.*

¶ 60    Beyond Herring's statements (both by phone and in person to friends and family members), Herring's guilt was corroborated by (i) phone records showing his calls to and from various friends and family, (ii) his fingerprint on an item in the garbage can taken from the scene and abandoned a few houses away, (iii) his cell phone's presence near the crime scene during the time it was committed, and (iv) Menzies's testimony that Herring had told her he wanted to take the Mustang's speakers. The record, taken as a whole and viewed in the light most favorable to the State, presents enough evidence for a rational trier of fact to find beyond a reasonable doubt that Herring committed the crime.

¶ 61                                    Evidentiary Rulings

¶ 62    Next, Herring takes issue with several evidentiary rulings. We review the admission of evidence for an abuse of discretion. *People v. Maldonado*, 402 Ill. App. 3d 411, 416 (2010). We will find an abuse of discretion only if the trial court's ruling is "arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." (Internal quotation marks omitted) *Id.*

¶ 63                               Hearsay—Stephen Peters

¶ 64    Herring argues that several statements from Stephen should not have been admitted. Specifically, that his car had been burgled and that he was going to the alley to wait for the police and for the burglar to return to claim the items in the garbage cans. Hearsay refers to an out-of-court statement offered to prove the truth of the matter asserted. *People v. Sangster*, 2014 IL App (1st) 113457, ¶ 60. But Stephen's statements were admitted under the "state-of-mind" exception to the hearsay rule contained in the Rule 803 (3)(A) of the Illinois Rules of Evidence. See Ill. R. Evid. 803 (3)(A) (eff. April 26, 2012) ("The following are not excluded by the hearsay rule, even though the declarant is available as a witness: (3) Then Existing Mental, Emotional, or Physical Condition. A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including: (A) a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will ***."). Admission of Stephen's statement was proper as the hearsay exception applies to statements about the declarant's state of mind, emotion, physical condition, or sensation. See *Chamberlain v. Civil Service Comm'n of Village of Gurnee*, 2014 IL App (2d) 121251, ¶ 44.

¶ 65    Herring argues that it wasn't necessary to explain Stephen's presence in the alley. But he cites no case holding that these statements do not qualify under the "state of mind" exception. The State need not use (or refrain from using) any particular piece of evidence to explain Stephen's actions.

¶ 66    Actually, Herring takes issue not so much with admissibility but with the State extrapolating that the person who burgled the Mustang must be the same person who shot Stephen and Flisk. This was a logical inference: that Stephen and Flisk, who were attempting to

find out who burgled the Mustang, were shot by the person trying to escape culpability for the burglary. It also derives support from (i) Laura's testimony that she saw someone pushing the garbage cans right after the murders and (ii) the car's equipment being found in the same garbage cans abandoned a few houses away. The State may encourage the jury to make reasonable inferences. See *People v. Frazier*, 2016 IL App (1st) 140911, ¶ 11 (trier of fact's responsibility to weigh evidence and draw reasonable inferences from evidence).

¶ 67                                     Hearsay—911 Call

¶ 68          Herring also argues that the 911 tape of Laura's call to police was inadmissible hearsay. The trial court admitted the tape under the "excited utterance" or "spontaneous declaration" exception to the hearsay rule. See Ill. R. Evid. 803 (2) (eff. April 26, 2012) ("The following are not excluded by the hearsay rule, even though the declarant is available as a witness: (2) Excited Utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."). To be admissible, there must be (i) an incident sufficiently startling to produce a spontaneous statement, (ii) no time for the declarant to fabricate the statement, and (iii) the statement must relate to the circumstances of the incident. *People v. Perkins*, 2018 IL App (1st) 133981, ¶ 68. We consider the totality of the circumstances, including (i) the time passed between the event and the utterance, (ii) the nature of the event, (iii) the declarant's mental and physical condition, and (iv) whether the statement is self-interested. *Id.*

¶ 69          Under this test, the 911 call qualifies. Hearing gunshots and seeing her son's body on the ground manifests "startling" so that Laura would speak spontaneously to the 911 operator. Little time passed between Laura hearing the first shots and calling 911, and she heard more shots while on the phone. There was no time for her to fabricate. And the 911 call related wholly to the

circumstances of the shooting. Herring seems to argue that the 911 call was too prejudicial for admission, but the court weighs the probative value of the evidence against the risk of unfair prejudice. *People v. Roman*, 2013 IL App (1st) 110882, ¶ 23. We find no abuse of discretion. *Id.*

¶ 70                    Double Hearsay—Prior Inconsistent Statements of Ebony Garrett

¶ 71        Herring argues error in admitting that Ebony had told police and prosecutors of Menzies telling her of Herring's confession. Herring argues that this evidence (admitted as both impeachment and substantively) constitutes inadmissible double hearsay.

¶ 72        This evidence presented a convoluted transmission of information: from Herring to Menzies, from Menzies to Ebony, and from Ebony to the police and grand jury. The last step was admissible as Ebony's prior inconsistent statement. See *Sangster*, 2014 IL App (1st) 113457, ¶¶ 60-62. The problem arises at the middle step: Menzies's statements to Ebony. The State offers no argument as to how those statements were not hearsay or were not offered for the truth of the matter asserted (that Herring killed Stephen and Flisk). Instead, the State seems to argue that the presence of the prior inconsistent statement at the end of the chain renders the intermediate steps nonhearsay as well. The State cites *People v. McLaurin*, 2015 IL App (1st) 131362, but *McLaurin* is inapposite. There, the witness had earlier testified that he heard an unknown person accuse the defendant, and the defendant laughed. *Id.* ¶ 46. So, there was no "double hearsay" problem: the witness heard this interaction directly—unlike Ebony, who heard about Herring's admission afterwards, through Menzies.

¶ 73        Nonetheless, the inculpatory value of Ebony's testimony about this conversation was that Herring had confessed to Menzies—and before Ebony testified, the jury heard this directly from Menzies. So Ebony's testimony on this point was cumulative as well as not terribly helpful since the State had the use her prior statements. We find any error harmless. See *People v. Lindsey*,

2016 IL App (1st) 141067, ¶ 21 (under harmless error analysis, State must prove beyond reasonable doubt that result would have been same without error).

¶ 74                                    Limiting Instructions

¶ 75        Herring next argues (in a cursory fashion) the inadequacy of the trial court's limiting instructions regarding hearsay evidence. He limits his argument to Stephen's statements and the impeachment evidence, so we will too.

¶ 76        Jury instructions must explain the correct principles of law that apply to the evidence, and not be misleading or confusing. *People v. Valadovinos*, 2014 IL App (1st) 130076, ¶ 23. When a jury does not receive proper guidance through instructions, it cannot perform its constitutional functions, violating the defendant's right to a fair trial. *Id.* To warrant reversal, a defendant must show that the claimed instructional error " 'creates a serious risk that the jurors incorrectly convicted the defendant because they did not understand the applicable law, so as to severely threaten the fairness of the trial.' " *People v. Durr*, 215 Ill. 2d 283, 299 (2005) (quoting *People v. Hopp*, 209 Ill. 2d 1, 8 (2004)).

¶ 77        When ruling on the admissibility of Stephen's statements, the trial court said it would consider issuing a limiting instruction. But Herring did not request one, though he did object to its admission. So he forfeited this argument. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). He does not argue that this forfeiture should be overlooked under the plain error doctrine.

¶ 78        As to the impeachment evidence, the trial court told the jury that Ebony's prior inconsistent statements were being offered to impeach her. Later, before deliberations, the trial court gave Illinois Pattern Jury Instructions, Criminal, No. 3.11 (4th ed. 2000), which discusses impeachment and the substantive use of prior inconsistent statements given under oath. Herring did not object to this instruction or argue that it did not sufficiently explain hearsay or the

distinction between impeachment and substantive evidence. *People v. Miller*, 363 Ill. App. 3d 67, 76-77 (2005). And there is a strong presumption that jurors follow trial court instructions. *People v. Gonzalez*, 379 Ill. App. 3d 941, 954-55 (2008). We find no error.

¶ 79                                    Prosecutorial Misconduct

¶ 80       Herring next argues that the State committed prosecutorial misconduct in several ways. We reject each of these contentions.

¶ 81       Many of Herring's arguments concern statements made in the State's opening or closing arguments. Prosecutors have wide latitude, and may comment on evidence and any fair inferences from that evidence. *People v. Sandifer*, 2016 IL App (1st) 133397, ¶ 53. We view the closing argument in its entirety, and any challenged remarks in context. *Id.* Closing argument must serve a purpose other than inflaming the jury's emotions. *People v. Wheeler*, 226 Ill. 2d 92, 128 (2007). But even if the prosecutor's comment was outside the bounds of propriety, we will not overturn a guilty verdict, unless the improper comment constitutes a "material factor" in conviction. *Sandifer*, 2016 IL App (1st) 133397, ¶ 53; see also *People v. Thompson*, 2015 IL App (1st) 122265, ¶ 36 (reversal warranted when remark caused "substantial prejudice").

¶ 82                                    Use of Hearsay Evidence

¶ 83       Herring argues that the State used hearsay evidence of Stephen's statements and Laura's 911 call in the opening and closing. Even if these arguments had been properly preserved, they are unpersuasive. The evidence was properly admitted as exceptions to the hearsay rule, and it is not error for the State to rely on properly admitted evidence or the inferences to be drawn from that evidence. *People v. Hubner*, 2013 IL App (4th) 120137, ¶¶ 24-27 (collecting cases).

¶ 84                                    Witnesses' Fear of Herring

¶ 85    Herring argues that the State improperly argued that State witnesses were afraid of Herring. It is improper for the prosecution to argue that a defendant threatened or intimidated a witness unless there is evidence to support it. *People v. Cox*, 377 Ill. App. 3d 690, 707 (2007). The State did not expressly or impliedly argue that Herring threatened these witnesses, and we find no error in the State's suggestion that certain witnesses were reluctant to implicate Herring. The prosecution never suggested that the witnesses' recalcitrance was due to Herring threatening or intimidating them, even though four of them had pending contempt petitions for failing to appear at trial. In any event, viewed in the context of the entire argument, nothing demonstrates this isolated comment was a "material factor" in Herring's conviction. *Sandifer*, 2016 IL App (1st) 133397, ¶ 53.

¶ 86                          Laura Peters's Suffering

¶ 87    Next, Herring argues that the State's closing argument improperly emphasized Laura's suffering. "[M]ere mention" of a victim's family does not entitle a defendant to a new trial. *People v. Jones*, 2011 IL App (1st) 092529, ¶ 33. To be reversible the evidence must cause the jury to believe it is "material." *People v. Harris*, 225 Ill. 2d 1, 31 (2007). The State reminded the jury of Laura's suffering, but never suggested that her pain inculpated Herring. We find no error.

¶ 88                          "Disgusting" and "Nuts"

¶ 89    Herring argues that the State's closing argument improperly characterized the defense argument as "disgusting" and "nuts." The State may challenge the credibility of the defense's theory if evidence supports that challenge but should not suggest that defense counsel lied or suborned perjury. *People v. Glasper*, 234 Ill. 2d 173, 207 (2009). The State did criticize the defense theory but without ridiculing defense counsel personally. See *People v. Robinson*, 391 Ill. App. 3d 822, 840-41 (2009) (collecting cases upholding convictions where State termed

defendant's theory "ridiculous," "preposterous," or "a joke"). Besides, the trial court sustained defense counsel's objection to the State characterizing defendant's theory as "nuts."

¶ 90                                             Intent to Use Videotape

¶ 91         Finally, in the most cursory manner, Herring argues that the State "sandbagged" the defense by not disclosing its intention to play 15 minutes of a 27-hour-long video of Herring in the interrogation room. Herring does not complain that the State violated discovery rules. Indeed, he admits the State disclosed the entire tape and that he litigated a motion *in limine* to bar other portions. Nor does Herring complain that he was unaware of Detective Carlassare as a potential witness. The rules of discovery force the State to reveal its evidence. Ill. S. Ct. R. 412 (eff. Oct. 1, 1971). The State need not preview trial strategy. That the defense may have overlooked the inculpatory nature of this portion of the video in no way suggests misconduct.

¶ 92                                        Ineffective Assistance of Counsel

¶ 93         Herring next argues that his trial counsel provided ineffective assistance, which requires analysis under the two-prong standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). See also *People v. Albanese*, 104 Ill. 2d 504, 525 (1984) (adopting *Strickland* standard). A defendant must show that counsel's representation was deficient—that it fell below an objective standard of reasonableness. *People v. Sharp*, 2015 IL App (1st) 130438 ¶ 100. The defendant also must show prejudice—a reasonable probability that, but for the deficiency, the result of the proceeding would have been different. *Id.* We apply a strong presumption that counsel acted reasonably. *Id.* ¶ 102.

¶ 94                                        Admission of Fingerprint Evidence

¶ 95         Herring argues that his counsel erred in not objecting on foundation grounds to the admission of expert testimony regarding the fingerprint recovered from the mirror bracket, later

identified as Herring's. To admit an object into evidence, a party must lay an adequate foundation: either through identification by witnesses or a chain of custody. *People v. Woods*, 214 Ill. 2d 455, 466 (2005). Herring takes issue with the final step in that chain—when the fingerprint expert examined the mirror bracket and other items from the garbage. But the "chain of custody" need not be perfect for admission. *People v. Alsup*, 241 Ill. 2d 266, 275 (2011).

¶ 96        There appears the police fingerprint examiner mislabeled and then corrected items from the garbage. The mistake went to the weight, not the admissibility, of the evidence. Moreover, Herring's counsel tried to exploit that confusion during lengthy cross-examination. This indicates that counsel recognized the import of the fingerprint evidence and tried to take advantage of error. Whether and when to object involves trial strategy; we are highly deferential to trial counsel in these situations. *People v. Perry*, 224 Ill. 2d 312, 344 (2007). Trial counsel decided to attack this point through cross-examination rather than try to exclude the evidence. We find no deficient performance. See *Strickland*, 466 U.S. at 697 (need not address both *Strickland* prongs when party makes insufficient showing of one prong).

¶ 97                        Cell Phone Location Data

¶ 98        Herring next argues ineffectiveness of trial counsel for failing to move to suppress the "location data" from Herring's cell phone. The FBI agent analyzed and testified to the location data at trial. (Herring does not take issue with the State's use of Herring's other phone records, which showed the outgoing and incoming phone numbers.) According to Herring, acquiring this location data required a warrant supported by probable cause, and the State did not get a warrant. Instead, the State used the "exigency" exception to the warrant requirement. The State, for its part, is unable to clarify whether it obtained the location data through the exigent circumstances request or under the warrant later obtained to seize Herring's cell phone.

¶ 99        Recently, the U.S. Supreme Court held that location data (unlike phone records showing incoming and outgoing calls) constitutes a "search" requiring a warrant supported by probable cause. *Carpenter v. United States*, 585 U.S. ___, ___, 138 S. Ct. 2206, 2221 (2018). Herring argues that trial counsel should have used *Carpenter* to suppress the location data.

¶ 100       Regardless of *Carpenter*'s applicability, which the State contests, Herring's claim fails under the prejudice prong of the *Strickland* standard. Even if the trial court had suppressed the location data, the outcome remains the same—the evidence was unimportant. The FBI agent testified that the location data showed Herring's cell phone connecting to cell phone towers in the neighborhood of the murders but admitted this also fits with Herring minding his own business at home since Herring lived near the crime scene. Had Herring presented an alibi defense, say he'd been across town when the murders occurred, then the agent's evidence would have been meaningful. As it stands, Herring has not shown a reasonable probability of a different outcome had the location data been suppressed, so we reject the claim.

¶ 101                     Constitutionality of Mandatory Natural Life Sentence

¶ 102       Finally, Herring argues that his natural life sentence (mandatorily imposed because he killed two victims) violates both the state and federal constitutions because its mandatory nature prevents the trial court from taking his age (19 years old) into account as mitigating evidence.

¶ 103       Herring can find no protection in the federal constitution. The United States Supreme Court has held that the eighth amendment protects juvenile offenders from capital punishment or mandatory life imprisonment without parole. *Roper v. Simmons*, 543 U.S. 551, 578-79 (2005); *Graham v. Florida*, 560 U.S. 48, 82 (2010); *Miller v. Alabama*, 567 U.S. 460, 489 (2012). These holdings were grounded in the Court's concern, based on scientific research about adolescent brain development, lack of maturity, vulnerability to bad influences, and responsiveness to

rehabilitation. *Roper*, 543 U.S. at 570. But the Court drew a line at the age of 18 years; while it acknowledged that the line was arbitrary, it "must be drawn." *Id.* at 574. Herring falls on the adult side of that line; the eighth amendment does not protect him from a life sentence and we reject any challenge on this ground.

¶ 104 As for Illinois law, in the wake of *People v. Harris*, 2018 IL 121932, involving an 18-year-old convicted of murder and attempted murder, this appeal is not an appropriate vehicle to consider his sentence. As in *Harris*, an as-applied constitutional challenge was not raised in the trial court, no evidentiary record exists to base Herring's constitutional claim, and the trial court made no findings of fact regarding his circumstances. *Id.* ¶ 40. Accordingly, we are unable to consider Herring's claim.

¶ 105 Affirmed.